IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

David A. Miller,                              )    Civil No. 07-267-JE
                                             )
                          Plaintiff,         )    FINDINGS AND
                                             )    RECOMMENDATION
              v.                             )
                                             )
Michael J. Astrue, Commissioner              )
of Social Security,                          )
                                             )
                          Defendant.         )
_____)

          Tim Wilborn
          19093 S. Beavercreek Road, PMB #314
          Oregon City, OR 97045
                 Attorney for Plaintiff


          Karin J. Immergut, U.S. Attorney
          Britannia I. Hobbs, Asst. U.S. Attorney
          1000 S.W. 3rd Avenue, Suite 600
          Portland, OR 97204-2902


FINDINGS AND RECOMMENDATION - 1

Stephanie R. Martz
Special Asst. U.S. Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075
            Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff David Miller brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a final decision of the Commissioner of Social Security (the

Commissioner) denying his claim for disability insurance benefits.  He seeks an order

reversing the Commissioner's decision denying his application for benefits and remanding

this action for an award of benefits.

The Commissioner's decision should be reversed, and this action should be remanded

for further proceedings as specified below.


### PROCEDURAL BACKGROUND

Plaintiff filed an application for disability insurance benefits on March 12, 2003,

alleging that he had been disabled since May 1, 2002, because of problems with his knees,

back, hip, and head.  During the administrative process, he also cited depression as a cause of

his alleged disability.  After his application had been denied initially and upon

reconsideration, he timely requested a hearing.

A hearing was held before Administrative Law Judge (ALJ) Riley Atkins on June 14,

2005.  In a decision filed on July 26, 2005, ALJ Atkins found that plaintiff was not disabled

within the meaning of the Social Security Act (the Act).


FINDINGS AND RECOMMENDATION - 2

That decision became the final decision of the Commissioner on December 28, 2006, when the Appeals Council denied plaintiff's request for review.  Plaintiff brings the present action to challenge the Commissioner's decision.


## FACTUAL BACKGROUND

Plaintiff was born in September, 1957.  He was 44 years old when he allegedly became disabled in 2002, and was 47 years old in 2005 when the ALJ issued his decision. On his application for disability benefits, plaintiff indicated that he had attended special education classes, and had completed ninth grade.  During psychological examinations, plaintiff reported that he did well during the first eight years of school, stopped performing academically when he began to be successful in sports, and attended high school sporadically until dropping out in the eleventh grade.

Plaintiff served in the United States Navy from 1975 to 1978, and received an honorable discharge.  He has past relevant work experience as a truck driver and delivery driver.

Plaintiff has a significant history of drug abuse and depression.


## MEDICAL RECORD

Plaintiff's medical record will be set out briefly here, and will be addressed in greater depth in the discussion below.

Plaintiff experiences pain in his back and knees.  He underwent an arthroscopic debridement and partial medial meniscectomy of the left knee in May, 2002, and underwent a total knee arthroplasty of that knee on September 20, 2002.  An MRI of the lumbar spine

FINDINGS AND RECOMMENDATION - 3

conducted in January, 2003, showed disc protrusion at L5-S1 and L4-5, degenerative disc disease at L4-5 and L3-4, and mild canal stenosis at L3-4 and L4-5.

Maxine Hoggan, Psy.D., began to treat plaintiff for mental health issues in November, 2002. Dr. Hoggan noted that plaintiff presented with symptoms of major depression, including sleep deficits, loss of concentration, feelings of failure, embarrassment, and irritability. Her chart notes indicate that plaintiff's condition improved significantly, and treatment was discontinued in February, 2003.

Plaintiff was evaluated for psychiatric treatment at the Veteran's Administration Medical Center in August, 2003. He reported that his interest in activities had diminished, and that he had low motivation, difficulty completing tasks, and had feelings of guilt. Plaintiff also reported that he had experienced some improvement in his pain, mood, and sleep after he was prescribed Velafaxine and Trazadone, but that some symptoms continued. Plaintiff reported that he was swimming for exercise, and that he was helping in a program to assist teenagers in his community. A mental status examination indicated that plaintiff was relatively cheerful and in good spirits, and there was no evidence of sadness or depression. Peter Natsios, M.D., diagnosed plaintiff with major depressive disorder, moderate, resolving, a history of polysubstance dependence in full, sustained remission, and chronic pain syndrome. Dr. Natsios assessed plaintiff's GAF as 60.

In a session with a social worker on April 5, 2004, plaintiff described a cycle of dependence on and withdrawal from narcotic pain medications, particularly oxycodone. Plaintiff stated that when he was unable to obtain a prescription, he would experience withdrawal, then would find another physician who would prescribe narcotic medications, "starting the process over again." Plaintiff related a long history of drug abuse, beginning

FINDINGS AND RECOMMENDATION - 4

while he was in the Navy, which included the use of marijuana, cocaine, heroin, amphetamines, and pain killers. Plaintiff stated that, since receiving drug treatment in 1998, he had used only pain medications.

In a progress note dated May 25, 2004, Dr. Natsios opined that, in order to fully resolve his depression, plaintiff would need to return to work or school, or would need retraining within his physical abilities. He opined that plaintiff's mental status did not prevent plaintiff from doing so.

In July, 2004, plaintiff entered a residential treatment program to address his overuse of oxycodone for what were described as "legitimate pain problems." Plaintiff reported experiencing "irritability, sedation, and euphoria," and stated that his sleep was disrupted and that his depression was increasing. After his prescription for oxycodone was replaced with a prescription for morphine, plaintiff reported that he felt better and that his ability to focus had improved.

While plaintiff was in treatment, examinations were performed to address his problems with pain. An MRI taken in late July, 2004, showed disc protrusion at L4-5 producing severe left lateral recess and neural foraminal stenosis, and partial sacralization of the L5 vertebra. Though EMG studies were consistent with acute left S1 radiculopathy, on examination, an evaluating neurosurgeon found no evidence that would correlate with true radiculopathy. Range of motion of the lumbar spine was limited. There was no major tenderness of the lumbar spine, but there was severe tenderness in the subtrochanteric area. The motor strength in plaintiff's lower extremities was intact, and his reflexes were symetrical. An examining physician observed that plaintiff was obese, and recommended aggressive weight loss, a muscle stabilization exercise program, and injections of the

FINDINGS AND RECOMMENDATION - 5

subtrochanteric bursa.  Plaintiff was diagnosed with posttraumatic stress disorder and major depression.  His GAF was assessed at 70 in August, 2004.  In early October, 2004, plaintiff was discharged from the treatment program early after he used marijuana while away from the facility on a pass.

In late November, 2004, Steven Gibson, M.D., a treating physician, noted that he intended to "taper" plaintiff off the use of narcotics altogether.  A chart note dated November 29, 2004, indicated that plaintiff "verbalized being very upset" over the plan to taper off his morphine.  After evaluation at a pain clinic on May 4, 2005, a Fentanyl patch was prescribed, and plaintiff was advised to discontinue his use of cannabis tea.

At the request of the Oregon Disability Determination Services, Rory Richardson, Ph.D., performed a psychological evaluation of plaintiff on April 27, 2005.  Plaintiff told Dr. Richardson that he had stopped using cannabis in 1984, and had last used alcohol in 1998.  Plaintiff told Dr. Richardson that he was being counseled through the Veteran's Administration for problems including depression, mood swings, paranoia, explosive anger, suicidal thoughts, memory problems, unrealistic fears, panic attacks, and obsessive compulsive tendencies.  Plaintiff reported that he had been abused as a child, and reported that he experienced nightmares related to accidents he had seen while driving a truck and flashbacks of problems he had encountered in traffic.  Plaintiff also reported panic attacks and depressive symptoms with anhedonia, lethargy, difficulty concentrating, and suicidal ideation.

Dr. Richardson performed a mental status examination.  He reported that plaintiff took a significant amount of time to follow through and perform tasks, that he was unable to perform serial 7's accurately, and that he was able to remember only two of four words after

FINDINGS AND RECOMMENDATION - 6

a 5-minute delay.   Dr. Richardson diagnosed major depressive disorder, recurrent, severe; rule out mood disorder, nos; posttraumatic stress disorder; anxiety disorder, nos; pain disorder with psychological factors and general medical condition; disorder of written expression; dyssomnia, nos; and avoidant and schizoid personality traits.  Dr. Richardson concluded that plaintiff had moderate limitations in his ability to understand and remember detailed instructions, make judgments on simple work-related decisions, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to changes in a routine work setting.  He concluded that plaintiff had marked limitations in his ability to carry out detailed instructions, interact appropriately with the public, and respond appropriately to work pressures in a usual work setting.

During a psychiatric evaluation conducted in May, 2005, plaintiff reported that he enjoyed swimming and going to the gym, and that he was active in his church and involved in caring for his teenage children.  His attention, concentration, and memory were assessed as intact, and his insight and judgment were rated as fair.  Plaintiff was diagnosed with pain disorder with psysiological and psychological factors; major depressive disorder, moderate, recurrent, currently depressed; non-combat PSTD; alcohol dependence in sustained remission; cocain dependence in sustained remission; and narcotic abuse.  His GAF was assessed as 59.   Discontinuation of cannabis use was recommended.

## HEARING TESTIMONY

At the hearing before the ALJ, plaintiff testified that the VA had provided him a cane a week and a half before the hearing, that he continued to experience significant pain in his lower back, and that he was sensitive to toxic odors and had problems with shortness of

FINDINGS AND RECOMMENDATION - 7

breath.  Plaintiff testified that he was taking 16 medications at the time of the hearing, and

that the side effects of these included sleeping too little and too much, lack of appetite and

excessive appetite, lack of a sex drive, and feeling stressed out.  Plaintiff added that he had

started using a Fentanyl patch for pain a few months earlier.  He testified that he averaged 4

to 5 hours sleep in a 24-hour period, had used cannabis tea approximately three times a week,

and had smoked cannabis a few times during the previous year, in order to help him sleep.

Plaintiff testified that he last used cocaine in 1998, and that he had been sober since 1999.  In

his testimony about his physical capabilities, plaintiff stated that he could walk two or three

blocks before needing to sit down for 10 minutes, had difficulty bending, could lift but not

carry 30 pounds without back pain, and could drive for one and a half hours.  Plaintiff

testified that he was approximately 6'2" tall, that he weighed approximately 300 pounds, that

he was doing physical therapy, and that he had been swimming for exercise until that caused

problems with the Fentanyl patch.

At the hearing, the ALJ posed a hypothetical to the VE describing an individual of

plaintiff's age, education, past relevant work experience, who had the residual functional

capacity required to lift 20 pounds occasionally and 10 pounds frequently, and to stand and

walk for 2 hours during an 8-hour work day and sit for 6 hours during such a work day.  The

hypothetical allowed only occasional climbing, stooping, kneeling, crouching, and crawling,

and precluded concentrated exposure to respiratory irritants and concentrated exposure to

hazards.  It also limited the hypothetical individual to unskilled work.

The VE testified that an individual described in the hypothetical could not perform

plaintiff's past relevant work, because plaintiff's former relevant jobs required the ability to

perform medium level work, which exceeded the exertional capacity described in the

FINDINGS AND RECOMMENDATION - 8

hypothetical. The VE testified that the individual described in the VE's hypothetical could work as a small products assembler, a ticket seller, or an electronics worker.

When asked to assume that plaintiff had the mental residual functional capacity limitations that Dr. Richardson had assessed, the VE testified that, for "multiple reasons," the individual described could not sustain employment in the specified occupations.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520©).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not

FINDINGS AND RECOMMENDATION - 9

meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.


**ALJ'S DECISION**

At the first step of the disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity after the date of the alleged onset of his disability.

FINDINGS AND RECOMMENDATION - 10

At the second step, the ALJ found that plaintiff's prescription opioid dependence; history of polysubstance abuse in partial remission; status following left knee replacement; lumbar degenerative disc disease; obesity; depressive disorder, NOS; posttraumatic stress disorder and pain disorder with both physical and psychological factors were "severe" impairments within the meaning of 20 C.F.R. §404.152©).[1]

At the third step, the ALJ found that plaintiff's severe impairments did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.

At the fourth step, the ALJ found that plaintiff had the residual functional capacity to lift 20 pounds occasionally and lift 10 pounds frequently, could stand and walk 2 hours out of an 8-hour workday and sit 6 hours out of an 8-hour day, could occasionally climb, stoop, crouch and crawl, could frequently balance, should avoid concentrated exposure to respiratory irritants and hazards, and was limited to unskilled work.[2]  Based upon his assessment of plaintiff's residual functional capacity, at the fourth step, the ALJ found that plaintiff could not perform any of his past relevant work.

At the fifth step, the ALJ found that, though plaintiff could not perform the full range of light work, he could perform jobs that existed in significant numbers in the national economy.  The ALJ cited work as a small products assembler, a ticket seller, and an electronics worker as jobs plaintiff could perform.

---

[1]In the narrative portion of his opinion, the ALJ stated that plaintiff's mental impairments result in mild restriction of plaintiff's activities of daily living, and that plaintiff had "mild difficulties in maintaining social functioning," had "moderate difficulties maintaining concentration, persistence or pace," and had "not experienced episodes of decompensation of extended duration."

[2]In assessing plaintiff's residual functional capacity, the ALJ found that plaintiff's description of his limitations was not wholly credible because it was inconsistent with substantial evidence in the record and because of inconsistencies in plaintiff's reports concerning his drug and alcohol use.

Based upon these findings, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act.

## STANDARD OF REVIEW

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## DISCUSSION

FINDINGS AND RECOMMENDATION - 12

Plaintiff contends that the ALJ erred in rejecting the assessment of Dr. Richardson, an examining medical source, in failing to comply with agency regulations that govern the evaluation of mental impairments, and in failing to include all of plaintiff's impairments in the hypothetical posed to the VE. For the reasons set out below, I disagree with the first of these assertions, agree with the latter two, and recommend remanding the action for further proceedings.

1. Rejection of the Opinion of Dr. Richardson

In general, the opinions of treating physicians are accorded more weight than the opinions of non-treating physicians, and the opinions of examining physicians are accorded more weight than the opinions of non-examining physicians. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Rejection of a treating doctor's uncontradicted opinions must be supported by clear and convincing reasons. Id. The Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining doctor, and must provide specific and legitimate reasons, which are supported by substantial evidence in the record, for rejecting opinions of an examining doctor that are contradicted by another doctor. Id. at 830-31.

As noted above, Dr. Richardson, an examining psychologist, concluded that plaintiff had moderate limitations in his ability to understand and remember detailed instructions, make judgments on simple work-related decisions, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to changes in a routine work setting. He concluded that plaintiff had marked limitations in his ability to carry out

FINDINGS AND RECOMMENDATION - 13

detailed instructions, interact appropriately with the public, and respond appropriately to work pressures in a usual work setting.

In his decision, the ALJ rejected Dr. Richardson's assessment of the seriousness of plaintiff's mental impairments.  In support of his preference for the opinion of Dr. Natsios, the ALJ stated that Dr. Richardson "did not have the benefit of reviewing recent records from the Veterans' Administration Medical Center (Exhibit 9F).  These records reflect drug and alcohol issues as well as noncompliance with treatment recommendations."  The ALJ noted that, though he had told Dr. Richardson that he had not used cannabis since 1984 and had not used alcohol since 1998, treatment records reflected "ongoing use of cannabis, despite recommendations from treatment providers that he stop using."  The ALJ also opined that Dr. Richardson's assessment was not consistent with the report of Dr. Natsios, who, the ALJ stated,  had indicated "that the claimant's mental health does not prevent him from returning to work/school/retraining within his physical abilities (Exhibit 9F-500)."  In rejecting Dr. Richardson's opinion that plaintiff had significant problem interacting with others, the ALJ cited plaintiff's report that he had many friends, was involved in church, helped run a support group, and worked with a group "trying to help teenagers avoid problems and succeed."

The parties disagree as to whether Dr. Richardson had access to all of plaintiff's records from the Veteran's Administration before he prepared his assessment.  They also disagree as to the extent of Dr. Natsios's contact with and treatment of plaintiff, and as to whether plaintiff's own reports of his daily activities are inconsistent with Dr. Richardson's assessment of the severity of his mental impairments.  In addition, they disagree as to whether the opinions of Dr. Natsios and Dr. Richardson are in fact contradictory.  Plaintiff

stresses that nearly a year had passed between the time Dr. Natsios last saw plaintiff and Dr. Richardson assessed plaintiff, and contends that Dr. Natsios did not actually test plaintiff or review his records.

In his report, Dr. Richardson referred to VA records, opining that "[t]he progress notes from the Portland Veterans Administration Medical Center appear to be very consistent with the reported complaints." Dr. Richardson noted that it appeared that there had been "some concern over his use of pain medications" and that it appeared that "efforts have been made to monitor the pain appropriately and obtain appropriate consultations." He also noted that plaintiff had "completed pain management contact through the Veterans Administration where he is being followed."

Despite these references, it appears that not all of plaintiff's records from the VA were available for Dr. Richardson's review. The Commissioner notes that Dr. Richardson evaluated plaintiff on April 27, 2005, and that the Veteran's Administration records included in exhibit 9F, which included references to plaintiff's ongoing use of cannabis, and indicated that plaintiff was attempting to "minimize" his use of the drug and noted plaintiff's failure to successfully complete an in-patient treatment program, were not compiled until May 12, 2005.

Turning to the question of Dr. Natsios's opportunity to fully evaluate plaintiff, I note that this treating physician first saw plaintiff on August 12, 2003. He agreed to serve as plaintiff's primary mental health provider, conducted a mental status examination, and wrote a six-page report that included a treatment plan. In that report, Dr. Natsios noted that he had informed plaintiff that he would not become involved "should there be any future legal or

disability-related issues . . . ."  Plaintiff missed his next appointment with Dr. Natsios, which was scheduled for September 17, 2003.

On April 28, 2004, plaintiff returned after missing several appointments with Dr. Natsios and a social worker.  At that time, Dr. Natsios again informed plaintiff of his "standard practice of not becoming involved in disability or legal proceedings, including making statements in my charting or in letters in support of these matters," and told plaintiff of his goal "to work towards improving or recovering social and occupational functioning, and the need to be creative and to adapt to the challenge and changes that occur through life." Dr. Natsios noted that plaintiff was offended by his "comments and questions," and that plaintiff interpreted his comments as "inferring that he was wrong to apply for social security."  He added that this discussion was "lengthy and difficult" and "precluded any opportunity to evaluate him clinically" at that time.  Plaintiff returned on May 25, 2004, to re-initiate treatment.  In his notes following that session, Dr. Natsios stated that plaintiff would "need to return to work/school/retraining (within his physical abilities), and his mental status does not prevent this."

After his appointment on June 15, 2004, Dr. Natsios  reported no significant changes in plaintiff's status.  Plaintiff began an in-patient treatment program on July 23, 2004, and was later discharged because of his drug use while on leave from the program.

Plaintiff missed a scheduled appointment with Dr. Natsios on November 10, 2004. During a telephone conversation with Dr. Natsios that day,  plaintiff complained about what he perceived to be Dr. Natsios's attitude toward his application for disability benefits, and asked Dr. Natsios if he would change the "statement" Dr. Natsios had made earlier. Dr. Natsios noted that plaintiff "became challenging and highly critical, questioning my

usefulness or legitimacy, and said he intended to file a complaint." Dr. Natsios recommended abstinence from "any abused drugs or alcohol," and indicated that plaintiff should be randomly tested for drug use. He added that he did not think that additional psychiatric diagnosis or a specialty treatment program would be helpful in plaintiff's recovery, and recommended occupational retraining.

This record supports the conclusion that Dr. Natsios had ample opportunity to evaluate plaintiff, and had contact with plaintiff a number of times over a period of time. From his progress notes, it is evident that Dr. Natsios was aware of plaintiff's treatment with other medical providers in the VA, and there is no question that he performed a mental status exam and took steps to provide treatment himself. Under these circumstances, Dr. Natsios clearly qualified as a treating physician, and the ALJ had ample basis upon which to afford significant weight to his opinion concerning plaintiff's mental impairments. Contrary to the plaintiff's contention, Dr. Natsios did not improperly offer conclusions about plaintiff's vocational ability when he opined that plaintiff's mental status did not preclude him from returning to school or work or pursuing retraining: Dr. Natsios did not comment upon how plaintiff's physical impairments would affect those pursuits. Instead, based upon his evaluation of plaintiff, he simply opined that plaintiff's mental status did not prevent him from doing so.

Contrary to plaintiff's contention, the opinion of Dr. Natsios in this regard appears to contradict that of Dr. Richardson. Though Dr. Richardson did not explicitly opine that plaintiff's mental impairments precluded his return to work, according to the VE's testimony, the marked and moderate impairments that he assessed in a number of work-related areas would not allow plaintiff to sustain competitive employment.

Given this difference of opinion between these treating and examining doctors, the question on review is whether the ALJ supported his rejection of the opinion of Dr. Richardson, the examining doctor, with the requisite "specific and legitimate" reasons. I conclude that he did. Though Dr. Richardson had some of plaintiff's VA records, it appears that some of the records he did not have contradicted his opinion that plaintiff was not using illegal drugs. Dr. Richardson's opinion concerning plaintiff's mental impairments was based, at least in part, on plaintiff's representations to him, including his representation that he was not using illegal drugs, and those representations were clearly not entirely credible.[3]

The ALJ's rejection of Dr. Richardson's opinion, in part, because it was inconsistent with that of Dr. Natsios, plaintiff's treating physician, was legitimate. As noted above, Dr. Natsios assessed plaintiff's mental status, advised plaintiff as to his treatment, knew of plaintiff's treatment by others during the time plaintiff received treatment through the VA, and had contact with plaintiff over a period of time. This treating medical source had an adequate basis for forming an opinion as to plaintiff's mental status, and that opinion was supported by other substantial evidence in the medical record.

The ALJ also provided specific and legitimate reasons for rejecting Dr. Richardson's opinions as to plaintiff's limitations in interacting with the public, supervisors, and co-workers. The ALJ correctly noted that plaintiff reported that he had many friends, was actively involved in church, helped run a support group, and served on a steering committee for a group working with teenagers, and the ALJ's citation to these activities provided a

---

[3]In the concluding paragraph of his opening and reply memoranda, plaintiff asserts without support that the ALJ improperly rejected his allegations and lay witness testimony. However, plaintiff has not seriously challenged the ALJ's conclusion that plaintiff was not wholly credible by addressing that issue in depth in the body of his memoranda.

FINDINGS AND RECOMMENDATION - 18

legitimate basis for rejecting Dr. Richardson's opinions as to plaintiff's limitations in interacting with others.


2. ALJ's Residual Functional Capacity (RFC) Assessment and Hypothetical Posed to the VE

Plaintiff contends that the ALJ's residual functional capacity (RFC) assessment was flawed because it included no analysis of plaintiff's mental RFC, and that the hypothetical posed to the VE was legally insufficient because it included no mental limitations. These issues are closely related.


a. RFC Assessment

As noted above, in the narrative portion of his opinion, the ALJ stated that plaintiff's mental impairments result in mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties maintaining concentration, persistence or pace. He also stated that plaintiff had "not experienced episodes of decompensation of extended duration." In his "Findings," the ALJ concluded that plaintiff's "severe" mental impairments included prescription opioid dependence, a history of polysubstance abuse in partial remission, depressive disorder, posttraumatic stress disorder, and pain disorder with both physical and psychological factors.

Plaintiff contends that the ALJ erred in failing to make any mental RFC assessment, and in failing to describe any limits in work-related activities that resulted from plaintiff's mental impairments. I agree. The medical record includes substantial evidence that plaintiff has significant mental impairments, and the ALJ found that plaintiff has several "severe" mental impairments, which he found did not meet or equal any impairment in the "listings." Despite

the evidence of mental impairments which he found were severe, the ALJ did not account for these impairments in his assessment of plaintiff's RFC.  Though the ALJ did not expressly state that this was his intention, he may have intended to account for plaintiff's mental impairments by restricting plaintiff to "unskilled" work.

The ALJ's failure to assess plaintiff's mental RFC is inconsistent with the requirements set out in 20 C.F.R. § 404.1520a(d)(3).  That regulation provides that, if the agency finds that a claimant has severe mental impairments that do not meet or equal an impairment in the listings, it will assess his residual functional capacity.  The ALJ's failure to assess plaintiff's mental RFC is also inconsistent with 20 C.F.R. § 404.154(c), which informs a claimant that, when the agency assesses his mental abilities, it will "first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis."  The ALJ did not do so here.

The Commissioner contends that the restriction of plaintiff to "unskilled" work reflected the ALJ's conclusion that plaintiff's mental impairments did not prevent him from understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, coworkers, and ususal work situations, and dealing with changes in a routine work setting.  Defendant's Brief at 12 (citing requirements for performing unskilled work set out in SSR 85-15).  This argument fails for several reasons.  The ALJ's decision is devoid of any discussion or finding that plaintiff can respond appropriately to supervision, coworker, and usual work situations, or any discussion or finding that plaintiff can deal with changes in a routine work schedule.  The decision is devoid of any assessment of plaintiff's mental RFC, and any mental RFC findings.  In addition, SSR 85-15 does not state that the abilities that defendant cites constitute all the mental abilities that are required to perform unskilled work: This Ruling

states that the mental demands of unskilled work <u>include</u> these abilities, and that a substantial

loss of the ability to perform these activities "would severely limit the potential occupational

base," and "would justify a finding of disability because even favorable age, education, or work

experience will not offset such a severely limited occupational base."  SSR 85-15.  Nothing in

this Ruling implies that the cited abilities include <u>all</u> of the mental abilities required to perform

unskilled work.  Moreover, SSR 85-15 specifically provides that a decision maker "must not

assume that failure to meet or equal a listed mental impairment equates with the capacity to do

at least unskilled work.  This decision requires careful consideration of the assessment of RFC."

 The ALJ's failure to assess plaintiff's mental RFC after finding that plaintiff had severe

mental impairments constitutes legal error, and requires that the decision finding that plaintiff

was not disabled be reversed.  In the absence of such an assessment, the record is not complete,

and additional issues need to be resolved before a determination of disability can be made.

Under these circumstances, the action should be remanded for further proceedings rather than

for an immediate award of benefits.  <u>See</u>, <u>e.g.</u>, <u>Smoen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir.

1996) (whether action is remanded for an award of benefits or for further proceedings depends

on whether outstanding issues must be resolved before determination of disability can be made).


b. <u>Sufficiency of ALJ's Hypothetical</u>

 As is also noted above, the ALJ's hypothetical to the VE described a person with

plaintiff's education and work experience who could lift 20 pounds occasionally and lift 10

pounds frequently, could stand and walk for 2 hours and sit for 6 hours in an 8-hour workday,

could climb, stoop, kneel, crouch, and crawl only occasionally, could not tolerate exposure to

concentrated respiratory irritants and hazards, and could perform only unskilled work.  Except

as might be implied by the restriction to unskilled work, the ALJ's hypothetical included no restriction based upon any mental impairments.

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments. Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing Baugus v. Secretary of Health & Human Services, 717 F.2d 443, 447 (9th Cir. 1983)). If the assumptions included in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value. Id.

Here, the ALJ's hypothetical fails to account for any limitations arising from plaintiff's severe mental impairments. In the absence of an RFC reflecting those impairments, and a hypothetical reflecting plaintiff's mental RFC, the VE's testimony that plaintiff could perform certain work does not constitute substantial evidence that plaintiff was not disabled. On remand, any hypothetical to a VE should reflect an assessment of plaintiff's mental RFC.


## CONCLUSION

A judgment should be entered reversing this action and remanding it to the agency for further proceedings. The judgment should require that, on remand, plaintiff's mental RFC will be expressly assessed, and that any hypothetical ultimately posed to a VE will reflect the limitations set out in that assessment.


## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due June 4, 2008. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection.  If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 19th day of May, 2008.


/s/  John Jelderks_____
John Jelderks
U.S. Magistrate Judge